IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

UNITED STATES OF AMERICA

v.                                                    Case No. 1:23-cr-138-HSO-RPM-1

LARRY DONNELL SMITH

**MEMORANDUM OPINION AND ORDER DENYING DEFENDANT LARRY DONNELL SMITH'S MOTION [35] TO DISMISS INDICTMENT**

Defendant Larry Donnell Smith was indicted for possessing a firearm while knowing he had been previously convicted of "a crime punishable by imprisonment for a term exceeding one year," in violation of 18 U.S.C. § 922(g)(1). *See* Doc. [3] (Indictment); Doc. [25] (Superseding Indictment). Defendant seeks dismissal of the indictment on grounds that § 922(g)(1) is unconstitutional as applied to him under the Second Amendment to the United States Constitution. *See* Br. [66]. Because Defendant's prior conviction for receipt of stolen property is theft-related, his as-applied challenge is foreclosed by Fifth Circuit precedent, and his Motion [35] should be denied.

I. BACKGROUND

In November 2023, Defendant Larry Donnell Smith ("Defendant" or "Smith") was charged with two counts of knowing possession of a firearm by a convicted felon in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(8). *See* Doc. [3] (Indictment); Doc. [25] (Superseding Indictment). Smith was previously convicted of two felonies in Alabama for breaking and entering a vehicle and receipt of stolen property. *United*

*States v. Smith*, No. 24-60600, 2025 WL 2938691, at *1 (5th Cir. Oct. 16, 2025) (per curiam). Smith moved to dismiss the Superseding Indictment [25], *see* Mot. [35], arguing that it violated the Second Amendment on its face and as applied to him, and that § 922(g)(1) violated the Equal Protection Clause and exceeded Congress's authority under the Commerce Clause, *see id*. The Court rejected Smith's as-applied challenge to § 922(g)(1), concluding that the Supreme Court's holding in *New York Rifle & Pistol Association v. Bruen*, 597 U.S. 1 (2022), did not clearly abrogate Fifth Circuit precedent holding § 922(g)(1) constitutional under the Second Amendment as applied to any individual with a qualifying felony. *See* Ord. [40] at 2. The Court rejected his other arguments as foreclosed by Fifth Circuit precedent. *See id*. Smith then pled guilty to one count of violating § 922(g)(1) on August 6, 2024, but reserved his right to appeal the denial of his Motion [35] to Dismiss. *See* Plea Agreement [45]; Minute Entry entered November 7, 2024; J. [51].

On appeal, Defendant argued that § 922(g)(1) was unconstitutional because it: (1) violates the Second Amendment as applied to him; (2) facially violates the Second Amendment; (3) is vague; (4) exceeded Congress's authority under the Commerce Clause; and (5) violates the Equal Protection Clause. *See Smith*, 2025 WL 2938691, at *2. Smith conceded that all but his as-applied challenge are foreclosed by Fifth Circuit precedent. *Id*. On November 6, 2025, the Fifth Circuit affirmed in part and vacated in part. The Fifth Circuit affirmed this Court's findings on Smith's foreclosed constitutional challenges. *See id*. at *3. The Fifth Circuit noted that much has changed in its Second Amendment jurisprudence since

2

this Court originally addressed Defendant's as-applied challenge, so it remanded to this Court to determine in the first instance whether § 922(g)(1) is unconstitutional as applied to Defendant.

## II. DISCUSSION

Smith is no stranger to the justice system. He has an extensive criminal history, including prior convictions for misdemeanor possession of paraphernalia and battery, which do not serve as predicate convictions for his indictment under § 922(g)(1). *See generally*, Presentence Report ("PSR") [49]. The Government argues that these prior offenses are indicative of Defendant's violent character, *see* Resp. [67] at 7, and urges the Court to consider this background because "[w]here, as here, the defendant's criminal record indicates that his firearm possession would be dangerous, there is no sound reason to overlook this conduct," *id*. Fifth Circuit precedent makes clear the only relevant considerations are

> those predicate offenses under § 922(g)(1) that are punishable by imprisonment for a term exceeding one year. Other convictions, arrests, or conduct are not relevant . . . .

*United States v. Morgan*, 147 F.4th 522, 528 (5th Cir. 2025) (internal quotation marks omitted); *see also United States v. Kimble*, 142 F.4th 308, 310 (5th Cir. 2025) (same); *United States v. Mitchell*, 160 F.4th 169, 186 (5th Cir. 2025) (same). Despite Defendant's criminal history, the Court is bound by these decisions, and the only conduct relevant to its analysis is Smith's predicate felony convictions for receipt of stolen property and breaking and entering a vehicle. *See* PSR [49] at 10-11.

Turning to the merits of Smith's as-applied challenge, as always, the Court begins with the plain text of the Second Amendment, which provides: "A well regulated Militia, being necessary to the security of a free state, the right of the people to keep and bear arms, shall not be infringed." U.S. CONST. amend. II. This right, though "fundamental," *United States v. Rahimi*, 602 U.S. 680, 690 (2024) (quoting *McDonald v. Chicago*, 561 U.S. 742, 778 (2010)), "is not unlimited," *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008); *see also Bruen*, 597 U.S. at 80 (Kavanaugh, J., concurring) ("Properly interpreted, the Second Amendment allows a 'variety' of gun regulations."). To define the contours of this right, the United States Supreme Court has formulated a two-step approach for evaluating Second Amendment challenges. *See Bruen*, 597 U.S. at 17; *Rahimi*, 602 U.S. at 691; *see also United States v. Diaz*, 116 F.4th 458, 466-67 (5th Cir. 2024), *cert. denied*, 145 S. Ct. 2822 (2025).

First, the Court considers whether "the Second Amendment's plain text covers the behavior the government seeks to regulate, in which event the Constitution presumptively protects that conduct." *Kimble*, 142 F.4th at 310-311 (citing *Bruen*, 597 U.S. at 24); *see also Diaz*, 116 F.4th at 463-64. "Second, if the individual's actions are covered by the amendment's text, '[t]he government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation.'" *Kimble*, 142 F.4th at 311 (quoting *Bruen*, 597 U.S. at 24) (alterations in original). Only if the Government meets its burden of demonstrating that the regulation comports with our Nation's historical

4

traditions "may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command." *Bruen*, 597 U.S. at 27 (citation omitted).

A.  The Second Amendment's Plain Text Covers Defendant's Conduct

The Government does not dispute that the Second Amendment covers Defendant's conduct. *See generally* Resp. [67]. "That is because convicted felons are 'unequivocally among the people protected by the Second Amendment.'" *Kimble*, 142 F.4th at 311 (quoting *United States v. Schnur*, 132 F.4th 863, 867 (5th Cir. 2025)). As applied to Smith, § 922(g)(1) "impinges upon a right secured by the Second Amendment," possession of a firearm, "so it presumptively protects him." *Mitchell*, 160 F.4th at 186. Because the plain text of the Second Amendment covers Smith's conduct, the burden "shifts to the government to demonstrate that regulating [Defendant's] possession of a firearm is 'consistent with the Nation's historical tradition of firearm regulation.'" *Diaz*, 116 F.4th at 467 (quoting *Bruen*, 597 U.S. at 24).

B.  Whether Defendant's Challenge is Foreclosed by Fifth Circuit Precedent or Whether the Government has Produced Adequate Historical Analogues

At step two, the government bears the "heavy burden," *Mitchell*, 160 F.4th at 177, of demonstrating "that regulating [Defendant's] possession of a firearm is 'consistent with the Nation's historical tradition of firearm regulation,'" *Diaz*, 116 F.4th at 467 (quoting *Bruen*, 597 U.S. at 24). To do this, the Government must "identify a well-established and representative historical *analogue*, not a historical *twin*." *Bruen*, 597 U.S. at 30 (emphasis in original). In assessing whether the

5

challenged law is "relevantly similar" to permissible firearms regulations, the Court considers "whether modern and historical regulations impose a comparable burden on the right to armed self-defense [i.e., the "how"] and whether that burden is comparably justified [i.e., "why"]." *Id.* at 29.  As the Fifth Circuit has explained,

> [t]he 'why' teaches that 'if laws at the founding regulated firearm use to address particular problems, that will be a strong indicator that contemporary laws imposing similar restrictions for similar reasons fall within a permissible category of regulations.'  The 'how,' by contrast, carefully signals that 'a law . . . may not be compatible with the right if it [regulates arms-bearing] . . . beyond what was done at the founding,' '[e]ven when a law regulates arms-bearing for a permissible reason.'

*Mitchell*, 160 F.4th at 177 (quoting *Rahimi*, 602 U.S. at 692) (alterations in original).

1.  <u>Defendant's As-Applied Challenge is Foreclosed by Fifth Circuit Precedent</u>

One of Smith's prior felony convictions was for knowingly receiving stolen property, namely a stolen 1974 Oldsmobile Cutlass, in violation of Alabama Code § 13A-8-18.  *See* Doc. [67-1] (State Court Indictment); PSR [49] at 11.  The Government contends that Defendant's as-applied challenge is foreclosed by the Fifth Circuit's holding in *Diaz* because Smith's conviction for receipt of stolen property "falls within the recognized category of theft offenses that the Fifth Circuit has determined qualify as a sufficient predicate for a § 922(g)(1) conviction."  Resp. [67] at 3 (citing *Kimble*, 142 F.4th at 311).  Simply put, the Government believes that the crime of receipt stolen property involves theft.  Defendant disagrees.  He argues that that no governing decision has ever established that receipt of stolen property is a "theft offense," and that "the offenses of 'theft' and 'receiving stolen

6

property' are clearly different in many ways." Reply [68] at 2. Neither party has explained their position on this in detail.

The Fifth Circuit has consistently recognized that "[t]heft" is one of "three categories of offenses that doom a defendant's as-applied challenge," so "if a defendant's predicate felony involves theft or violence, his as-applied challenge to § 922(g)(1) will fail." *Kimble*, 142 F.4th at 311-312; *see also Diaz*, 116 F.4th at 472 (holding that Diaz's as-applied challenge to § 922(g)(1) failed because theft was historically punished permanently and severely); *Schnur*, 132 F.4th at 871 ("Based on [Defendant's] two-theft related felony convictions, *Diaz* forecloses [Defendant's] as-applied challenge."); *United States v. Hemphill*, No. 24-50527, 2025 WL 1898366, at *1 (5th Cir. July 9, 2025) (per curiam) ("We recently held in *Schnur*, however, that *Diaz* also forecloses an as-applied challenge by any individual convicted of 'theft-related' offenses such as robbery and burglary."); *United States v. Collette*, No. 22-51062, 2024 WL 4457462, at *2 (5th Cir. Oct. 10, 2024) (per curiam), *cert denied*, No. 24-6497, 2025 WL 1787754 (U.S. June 30, 2025) (applying *Diaz* to foreclose as-applied challenge brought by defendant whose predicate felony was theft); *United States v. Charles*, No. 23-50131, 2025 WL 416092, at *1 (5th Cir. Feb. 6, 2025) (per curiam) (same).

After careful review, the Court concludes that the crime of receipt of stolen property involves theft, foreclosing Defendant's as-applied challenge to § 922(g)(1). Smith was convicted of receipt of stolen property in violation of Alabama Code § 13A-8-18. Chapter 8 of the Alabama Code is titled "Offenses Involving Theft," and

encompasses Alabama Code §§ 13A-8-1 to 13A-8-233.  Article 1 of Chapter 8 is titled "Theft and Related Offenses," encompassing Alabama Code §§ 13A-8-1 to 13A-8-23, and "Receiving Stolen Property," Ala. Code §§ 13A-8-18, is included as one of these "Theft and Related Offenses," *see* Ala. Code §§ 13A-8-16 to 13A-8-19.  In other words, the crime of "receiving stolen property" falls squarely under "Offenses Involving Theft" and "Theft and Related Offenses" under Alabama law.

Alabama is not alone.  Many states' "theft" statutes encompass receiving stolen property.  *See, e.g.*, Alaska Stat. Ann. §§ 11.46.100 to 11.46.295 (Article 1, "Theft and Related Offenses," defining theft, § 11.46.100 and encompassing "Theft by receiving," § 11.46.190); Ark. Code Ann. §§ 5-36-101 to 5-36-405 (Chapter 36, Subtitle 4 including "Theft," § 5-36-101, and encompassing § 5-36-106 for "Theft by Receiving"); Conn. Gen. Stat. Ann. §§ 53a-119 to 53a-119(18) (Chapter 952, Part IX defining "Larceny," § 53a-119, and encompassing § 53a-119(8) for "Receiving stolen property"); Ga. Code Ann. §§ 16-8-1 to 16-8-106 (Chapter 8, Article 1 "Theft," encompassing § 16-8-8 for "Theft by Receiving Stole Property"); Haw. Rev. Stat. Ann. §§ 708-830 to 708-839.9 (Chapter 708, Part IV, including "Theft," § 708-830, and encompassing § 708-830(7) for "Receiving stolen property"); Ky. Rev. Stat. Ann. §§ 514.010 to 514.170 (Chapter 514, including "Theft and Related Offenses," and encompassing § 514.110 for "Receiving Stolen Property"); Me. Rev. Stat. Ann. tit. 17-A §§ 351 to 363 (Chapter 15, titled "Theft," and encompassing § 359 for "Receiving Stolen Property"); N.J. Stat. Ann. §§ 2C:20-1 to 2C:20-22 (Chapter 20, titled "Theft and Related Offenses," and encompassing § 2C:20-7 for "Receiving

8

stolen property"); N.D. Cent. Code Ann. §§ 12.1-23-01 to 12.1-23-19 (Chapter 12.1-23 titled "Theft and Related Offenses," including § 12.1-23-02 for "Theft of property," and encompassing § 12.1-23-02(3) (knowingly receiving stolen property)); Or. Rev. Stat. Ann. §§ 164.005 to 164.900 (Chapter 164, including § 164.015 for "Theft," and encompassing § 164.095 for "Theft by Receiving"); 18 Pa. Stat. and Cons. Stat. Ann. §§ 3901 to 3963 (Chapter 39 titled "Theft and Related Offenses," encompassing § 3925 for "Receiving Stolen Property" and noting that a person is guilty of "theft" when convicted under that section); Wyo. Stat. Ann. §§ 6-3-401 to 6-3-414 (Chapter 6, Article 4 including § 6-3-401, for "Theft," and encompassing § 6-3-402(a)(ii) (making it a crime of "theft" when a person knowingly receives the property of another)). And at least one federal statute, the Immigration and Nationality Act, 8 U.S.C. § 1101, defines an "aggravated felony" to include "a theft offense (including receipt of stolen property) . . . ." 8 U.S.C. § 1101(a)(43)(G). Intuitively this makes sense; receipt of stolen property is theftuous[1] in that there must first be a theft before a person can knowingly receive stolen property. One necessarily depends on the occurrence of the other.

If any doubt remained whether receipt of stolen property "involves theft," Chapter 8 of the Alabama Criminal Code, again titled "Offenses Involving Theft," encompasses Alabama Code §§ 13A-8-1 to 13A-8-33, which includes both "Receiving Stolen Property" and "Robbery." *See* Ala. Code tit. 13A, Ch. 8, art. 1 ("Theft and Related Offenses," encompassing "Receiving Stolen Property, Ala. Code §§ 13A-9-16

---

[1] "(Of an act) characterized by theft." *Theftuous*, Black's Law Dictionary (12th ed. 2024).

9

to 13A-9-19); Ala. Code tit. 13A, Ch. 8, art. 2 ("Robbery," encompassing Ala. Code §§ 13A-8-40 to 13A-8-44). And the Fifth Circuit recently concluded that crimes such as "robbery" are "theft-related," and foreclose a defendant's as-applied challenge. *See Schnur*, 132 F.4th at 871.

Defendant's prior conviction for receipt of stolen property "involves theft," foreclosing his as-applied challenge to § 922(g)(1). *See Kimble*, 142 F.4th at 311-312; *Schnur*, 132 F.4th at 871. Receipt of stolen property necessarily involves theft, and at the Founding, theft was a felony that "would have led to capital punishment or estate forfeiture." *Diaz*, 116 F.4th at 469-70. Because one of Defendant's predicate convictions is a crime involving theft, his as-applied challenge is foreclosed by Fifth Circuit precedent, and his Motion [35] to Dismiss Indictment should be denied for this reason.

2.  <u>Disarmament for Convictions Such as Defendant's for Receipt of Stolen Property is Consistent with the Nation's Historical Tradition of Firearm Regulation</u>

Even if Smith's as-applied challenge were not foreclosed by Fifth Circuit precedent, sufficient historical analogues exist to support his disarmament. Here, the Court's review indicates that the relevant historical analogues should address how receipt of a stolen horse was treated at the Founding. This is because horses were the colonial-era equivalent of the modern automobile, *see Diaz*, 116 F.4th at 468 (noting that the closest colonial-era analogue to vehicle theft was likely horse theft), and Smith's conviction for receiving stolen property involved receipt of a stolen 1974 Oldsmobile Cutlass, *see* Doc. [67-1] (State Court Indictment); PSR [49] at 11.

10

The Government points to two historical analogues to justify Smith's disarmament: (1) a 1748 law from Colonial Virginia, *see* Resp. [67] at 3 (citing WILLIAM HENING, 6 THE STATUTES AT LARGE; BEING A COLLECTION OF ALL THE LAWS OF VIRGINIA 130 (XIV) (1748)) (hereinafter "A COLLECTION OF ALL THE LAWS OF VIRGINIA"); and (2) a 1744 law from Colonial Maryland, *see id.* at 4 (citing *Wright v. Sas*, 187 Md. 507, 510 (1947) (citing Act of 1744, ch. 20)). According to the Government, these laws demonstrate that "[k]nowingly receiving a stolen horse was treated harshly in colonial times," and qualified as a capital offense, *see id.* at 3, and that "[t]reating receipt of a stolen horse as a capital crime carried over well after the Nation's founding," *id.* at 4 (citing *Price v. Commonwealth*, 62 Va. 846, 851-53 (1872)).

Smith responds that these laws do not prove a historical tradition justifying his permanent disarmament. According to Defendant, two laws are numerically insufficient to evidence a well-established historical tradition because the Supreme Court has expressed doubt whether "three colonial regulations" were enough. Br. [66] at 3 (citing *Bruen*, 597 U.S. at 46); Reply [68] at 1 (same). But Second Amendment jurisprudence under *Bruen* is less about requiring the Government to proffer a magic number of colonial laws—though more than two laws would certainly help show a tradition—and more about comparing the how and why of a modern regulation to a historical one. *See Bruen*, 597 U.S. at 29 (noting that this inquiry was "central" to analogical reasoning); *see also Rahimi*, 602 U.S. at 692; *id.* at 740 (Barrett, J., concurring) ("Analogical reasoning under *Bruen* demands a

11

wide[] lens: Historical regulations reveal a principal, not a mold."); *Mitchell*, 160 F.4th at 177 ("[C]ourts must rely on a mix of 'analogical reasoning and sound judgment' to determine whether a 'conceptual fit exists between the old law and the new.'") (quoting *United States v. Connelly*, 117 F.4th 269, 274 (5th Cir. 2024)).

Defendant also maintains that receipt of stolen property was a misdemeanor at the Founding and cites colonial laws to support this position. *See* Br. [66] at 6. But at the Founding, states distinguished between offenses involving stolen goods and those involving stolen horses. *See, e.g.*, JOHN MELCHER, THE LAWS OF NEW-HAMPSHIRE, AND THE CONSTITUTION OF THE UNITED STATES, WITH ITS PROPOSED AMENDMENTS 277, 281-82 (Portsmouth, 1797) (herein after "THE LAWS OF NEW-HAMPSHIRE") (1792 law having separate acts for horse-stealing, theft, and receipt of stolen goods); AUGUSTINE DAVIS, A COLLECTION OF ALL SUCH ACTS OF THE GENERAL ASSEMBLY OF VIRGINIA 188 (Richmond, 1794) (hereinafter "ACTS OF THE GENERAL ASSEMBLY OF VIRGINIA") (1792 law including a separate section for horse-stealing and receiving stolen goods); *see also* TIMOTHY CUNNINGHAM & JOHN ADAMS, 2 A NEW AND COMPLETE LAW DICTIONARY (1764).[2] This reflects a historical tradition of treating offenses involving horse-stealing more seriously than crimes involving theft of other goods. *See, e.g.*, Lael Weinberger, *The Limits of Church Autonomy*, 98 NOTRE DAME L. REV. 1253, 1302 (2023) ("By 1600, there was a distinction between

---

[2] This dictionary lists "stolen goods" and "Horses" separately. *See* TIMOTHY CUNNINGHAM & JOHN ADAMS, 2 A NEW AND COMPLETE LAW DICTIONARY 248, 693. Notably, "Horse" directs the reader to "Felonies without clergy, (under Felony) tit. Accessories and Horse-Stealing." *Id.* at 248. Part of the definition of "stolen goods" directs the reader to "Chattels," which lists "horse" as an example, but all horse-related felonies are separate from goods-related felonies under accessories and felonies. *See generally id.*; TIMOTHY CUNNINGHAM & JOHN ADAMS, 1 A NEW AND COMPLETE LAW DICTIONARY (1764). In other words, crimes involving horses were distinct from crimes involving "goods."

12

felonies considered too serious to be 'clergyable' and minor ones that were still granted an immunity. The serious ones were murder, house-breaking (burglary), horse-stealing . . ."); Robert A. Stein, *The History and Future of Capital Punishment in the United States*, 54 SAN DIEGO L. REV. 1, 4 (2017) ("By the time of Independence, all of the colonies had similar death statutes covering arson, piracy, treason, murder, sodomy, burglary, robbery, rape, [and] horse-stealing . . ."). As a result, the relevant historical analysis should be focused on how the crimes of horse-stealing, accessory after the fact to horse-stealing, and knowingly receiving a stolen horse were treated at the Founding.

The Virginia law cited by the Government provided that

XIV. And forasmuch as felons are much encouraged to steal horses, because a great number of persons make a trade, to receive and buy of such felons the horses by them feloniously taken, and also do make it their business to conceal such offenders, after the said fact, knowing such felonies to be by them committed; Be it therefore enacted by the authority aforesaid, *That if any person or persons shall receive, or buy, any horse that shall be feloniously taken, or stolen, from any other person, knowing the same to be stolen; or shall harbour or conceal any horse-stealer, knowing him, her, or them to be so, such person or persons shall be taken and received as accessary or accessaries to the said felony, and being of either of the said offences legally convicted, by the testimony of one or more credible witness or witnesses, shall incur and suffer the pain of death, as a felon convict.*

XV. *Provided always,* That if any such principal felon cannot be taken, so as to be prosecuted and convicted of any such offence, yet nevertheless it shall and may be lawful, to prosecute and punish every such person and persons, buying or receiving any horses stolen, by any such principal felon, knowing the same to be stolen, as for a misdemeanor, to be punished by fine and imprisonment, or other such corporal punishment as the court shall think fit to inflict, altho' the principal felon be not before convict of the said felony, which shall exempt the offender from being punished as accessary, *if such principal felon shall be afterwards taken and convicted.*

13

A COLLECTION OF ALL THE LAWS OF VIRGINIA, at 128-29 (emphasis added).  The Government argues that the law punished receivers of stolen horses with death.  *See* Resp. [67] at 3.  Smith counters that when read in its entirety, it was the "*principal felon*, i.e., the thief who had reason to conceal his crime" who was punished by death, *id.,* and where the "principal felon could not be taken, then those who had bought or received a horse—stolen by a principal felon—could be punished *for a misdemeanor*," *id.* (emphasis in original).

Defendant's interpretation is not persuasive because the "provided always" clause was meant to address accessories (receivers) who would otherwise benefit from concealing the *principal*:

> But because *these receivers* [of stolen goods] *often conceal the principal felons*, and thereby *escape being punished as accessories*; therefore by [statute] it is enacted that 'whoever shall buy or receive stolen goods, knowing them to be stolen may be prosecuted for a misdemeanor, and punished by fine or imprisonment, though the principal felon be not convicted'; and this shall exempt them [the receiver] from being punished as accessories, *if the principal shall afterwards be convicted*.

TIMOTHY CUNNINGHAM & JOHN ADAMS, 1 A NEW AND COMPLETE DICTIONARY, 21 (1764) (emphasis added).  The "provided always" exception remedied the common law pitfall that the accessory could not be charged with *any crime* absent the principal.  In other words, under the Virginia law, a person who knowingly received a stolen horse could be charged as an accessory and suffer death as a felon if the principal was known, or the receiver could be charged with a misdemeanor if the principal was unknown, an exception made because of the seriousness of the offense.  Capital punishment was still the default punishment for receivers of stolen horses in colonial Virginia.  *See, e.g.*, A COLLECTION OF ALL THE LAWS OF VIRGINIA, at

14

128-29; ACTS OF THE GENERAL ASSEMBLY OF VIRGINIA, at 188 (including a 1792 statute punishing knowingly receiving a stolen horse with death).

Turning next to the Maryland law cited by the Government, it provided that

> Be it Enacted by the Right Honourable the Lord Proprietary, by and with the Advice and Consent of his Lordship's Governor, and the Upper and Lower Houses of Assembly, and the Authority of the same, That all and every Person and Persons, who shall hereafter feloniously take or steal any Horse or Horses, Mare or Mares, Gelding or Geldings, Colt or Colts, within this Province, and all Laws Aiders, Abettors, and Accessaries, either before or after the Fact, of any such Takers or Stealers, *and all and every Person and Persons who shall buy, take, or receive any stolen Horse, Mare, Gelding, or Colt, knowing the same to be feloniously taken or stolen, and shall be thereof convicted*, by Confession or Verdict, or be outlawed, or will not upon Arraignment answer directly according to Law, or shall wilfully and of Malice stand mute, or shall peremptorily challenge above Twenty, shall *for every such Offence or Offences as aforesaid, suffer Death as a Felon*, without Benefit of Clergy.

42 PROCEEDINGS AND ACTS OF THE GENERAL ASSEMBLY OF THE PROVIDENCE OF MARYLAND 1740-1744, at 613-14 (Baltimore, Bernard Christian Steiner, ed., Md. Hist. Soc'y 1923) (emphasis added).

These two laws demonstrate that at the time they were passed—and through the Founding—receiving a stolen horse was a capital offense. *See id.* (noting that the Maryland legislature continued this act at least through 1796, including in 1780 and 1789); A COLLECTION OF ALL THE LAWS OF VIRGINIA, at 128-29; *see also* ACTS OF THE GENERAL ASSEMBLY OF VIRGINIA, at 188 (including a 1792 statute punishing knowingly receiving a stolen horse with death).

The Court's own research supports the conclusion that, at the Founding, horse-stealing was considered a capital offense, and receivers of stolen horses were

15

considered accessories and punished in the same manner as the principal.[3] *See, e.g.,* HORATIO MARBURY & WILLIAM H. CRAWFORD, DIGEST OF THE LAWS OF THE STATE OF GEORGIA 256-257 (Savannah, 1802) (including a 1793 statute that punished "accessories" to horse stealing with death); 25 THE ACTS OF NORTH CAROLINA GENERAL ASSEMBLY, 1790, 74 (The University of North Carolina at Chapel Hill, 2004) (principal for horse-stealing punished with death); R. AITKEN, 2 THE PUBLIC LAWS OF THE STATE OF SOUTH-CAROLINA, FROM ITS FIRST ESTABLISHMENT AS A BRITISH PROVIDENCE DOWN TO THE YEAR 1790, INCLUSIVE, 468 (Philadelphia, 1790) (making horse-stealing a capital offense). While some states did not punish horse-stealing with death, these states often inflicted draconian and permanent punishment on both principal and receiver. *See, e.g.,* THE LAWS OF NEW-HAMPSHIRE, at 281-82 (punishing horse-stealing with a permanent face tattoo, that if faded, would be marked again); SAMUEL & JOHN ADAMS, 2 LAWS OF THE STATE OF DELAWARE, 668-669 (New Castle, 1793) (Punishing the receiver of a stolen horse with a fine of two times the value of the horse if it could be returned. Failure to

---

[3] At the Founding, the crime of "accessary after the fact" was "where a person knowing the felony to be committed by another, receives, relieves, comforts or assists the felon. This holds place only in felonies, and in those felonies, where by [sic] the law judgment of death regularly ought to ensue . . ." TIMOTHY CUNNINGHAM & JOHN ADAMS, 1 A NEW AND COMPLETE DICTIONARY, at 20. This definition did not neatly fit crimes of receipt, so it was common for legislatures to enact statutes providing that "if any person shall receive or buy knowingly any stolen goods, or knowingly harbour or conceal any felon, he shall be taken as accessary to the felon, and shall suffer death as a felon." *Id.* Blackstone's Commentaries also acknowledge the tension between an "accessory" and a "receiver" of stolen property: "To buy or receive stolen goods, knowing them to be stolen, falls under none of these descriptions; it was therefore at common law, a mere misdemeanor, and made not the receiver accessory to theft . . . but now by statutes [] all such receivers are made accessories . . ." 4 W. BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND 37-38 (1775). The next page makes clear that the benefit of clergy for accessories after the fact does not apply to linen goods or horse-stealing. *Id.* at 39. In sum, at the Founding, horse-stealing was considered a capital offense, and receivers of stolen goods and stolen horses, were often punished as accessories. And accessories were punished the same as the principal.

16

return the horse resulted in a four-times fine, thirty-nine lashings, an hour in the pillory, and permanent disfigurement by having the "soft part" of the ear cut off).

This record reflects a well-established historical tradition of permanently and severely punishing horse-stealing and those who knowingly received stolen horses. Because the historical analogue to Smith's offense was a capital offense at the time of the Founding, it imposed a relevantly similar burden on him as does § 922(g)(1) today. *See Diaz*, 116 F.4th at 469. And this burden is comparatively justified. At the Founding, horse thievery was "frequent" and a "great detriment" to colonists, A COLLECTION OF ALL THE LAWS OF VIRGINIA, at 128-29, and legislatures were concerned about the "great number of persons" who received or bought stolen property, ACTS OF THE GENERAL ASSEMBLY OF VIRGINIA, at 188; *see also* 25 ACTS OF THE NORTH CAROLINA GENERAL ASSEMBLY, 1790, at 74 (repealing 1787 law that punished horse-stealing with corporal punishment and branding the letter "H" on the cheek, and replacing it with a law punishing horse-stealing as a capital offense because other punishments were "insufficient" to deter crime). The same is true for automobile theft. Alabama's receipt of stolen property laws penalized Smith for knowingly receiving stolen property. *See* Ala. Code § 13A-8-18. This penalty was meant to deter future lawlessness and ensure public safety, *see* Acts 1977, No. 607, p. 812, § 105 (describing the purpose of the Alabama criminal code), the same rationale which supported permanent disarmament for theft-related felonies in *Diaz, see Diaz*, 116 F.4th at 469.

17

Because at the time of our Nation's Founding, the analogue of one of the predicate crimes upon which Smith's § 922(g)(1) conviction relies—receiving stolen property, specifically an automobile—was a felony and led to capital or permanent punishment, disarming Smith "fits within this tradition of serious and permanent punishment." *Id.* at 470.[4]  His as-applied challenge should be denied.

### III. CONCLUSION

To the extent the Court has not addressed any of the parties' remaining arguments, it has considered them and determined that they would not alter the result.

**IT IS, THEREFORE, ORDERED AND ADJUDGED** that, Defendant Larry Donnell Smith's Motion [35] to Dismiss based on his as-applied challenge is **DENIED**.

**SO ORDERED AND ADJUDGED**, this the 11th day of February, 2026.

*s/ Halil Suleyman Ozerden*
HALIL SULEYMAN OZERDEN
CHIEF UNITED STATES DISTRICT JUDGE

---

[4] Because one of Smith's predicate felonies supports his disarmament, the Court need not address his other.